UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TAMMY R. DYE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CAUSE NO. 1:11-CV-00402-TWP-TAB |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

### ENTRY ON JUDICIAL REVIEW

Plaintiff, Tammy R. Dye[1] ("Ms. Dye") filed this action pursuant to 42 U.S.C. § 1382(c), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her supplemental security income ("SSI") claim under the Title XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is AFFIRMED.

### I. BACKGROUND

Ms. Dye was born on April 4, 1972. (R. at 103). At the time of the hearing she was thirty-seven years old; she had attended high school to the ninth-grade education, and had not obtained a Graduate Equivalency Diploma (GED). (R. at 168). Her alleged onset date is January 1, 2000. (R. at 16). Ms. Dye has sporadic relevant work experience, she has worked at a school

---

[1] Since filing her claim, Tammy R. Smalley has divorced and remarried. R. at 100. Her current married name is "Tammy R. Dye". R. at 168. She has also used Tammy R. Isaac, which is her maiden name. R. at 170. For purposes of this order, she will be referenced as "Tammy R. Dye" or "Ms. Dye".

1

cafeteria and taken care of the elderly, but had not engaged in substantial gainful activity since the application date. (R. at 18, 33,168).

### A. Procedural History

Ms. Dye filed an application for SSI on November 28, 2006, alleging she became disabled on January 1, 2000. (R. at 16). The claim was denied initially on February 21, 2007 and upon reconsideration on June 5, 2007. (R. at 16). Thereafter on February 19, 2008, Ms. Dye filed a written request for a hearing on July 16, 2007. On July 7, 2009, the claimant appeared and testified in Indianapolis, Indiana, via video conference before Administrative Law Judge L. Zane Gill ("ALJ") who presided over the hearing from Falls Church, Virginia. (R. at 16). On September 24, 2009, the ALJ issued his decision finding that Ms. Dye was not disabled. (R. at 35). On February 10, 2011, the Appeals Council denied review of the ALJ's decision. (R. at 1). The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review.

### B. Medical History

Ms. Dye's earliest medical evidence in the record begins with her evaluation conducted by Dr. Russ Rasmussen ("Dr. Rasmussen") on January 4, 2006 at the request of the Disability Determination Department. (R. at 179). Dr. Rasmussen found Ms. Dye's remaining functional mental capacity to be "moderately impaired". (R. at 181). Dr. Rasmussen also noted that Ms. Dye's physical pain limited her ability to do daily chores and that her attention and focus are fair to poor. (R. at 181). His impression of Ms. Dye included major depression that was recurrent but moderate and a Global Assessment Functioning ("GAF") score of 45. (R. at 181).

Ms. Dye was seen by Dr. Mahmoud Yassin Kassab ("Dr. Kassab") on January 7, 2006. (R. at 191). Dr. Kassab found Ms. Dye had a full range of motion in her cervical and lumbar

spine, shoulders, elbows, wrists, knees, hips and ankles. (R. at 191). He also noted that Ms. Dye's lack of any medication for her subjective pain, gave him "the idea that she might have exaggerated her problem". (R. at 191). He therefore concluded that Ms. Dye could grasp, lift, carry, and manipulate objects with both hands and could perform repeated movements with both feet. (R. at 192).

On January 19, 2006, under the direction of her mother, Ms. Dye went to Anderson Family Practice ("the clinic") because she had "lost it". (R. at 257). Apparently, she had an episode of increased "anger and banging [her] head on [the] steering wheel while driving." (R. at 212). The report notes Ms. Dye was experiencing acute depression and suicidal ideation. (R. at 257). The doctor directed her to the Gallahue Crisis Center ("the Center"). (R. at 257).

At the Center, Ms. Dye was diagnosed with severe major depression and her GAF score was 50. (R. at 197-98). She was sent home with her mother on January 19, 2006, with a scheduled follow-up evaluation for January 24, 2006. (R. at 212). At her follow-up visit, she discussed her previous medical history as well as her head injury and seizure that had occurred 12 years prior. (R. at 212). She had lost consciousness at the time and was placed on medications that she could no longer member. (R. at 212). She was prescribed a trial of Zoloft to target her depression and anxiety as well as trazadone and her GAF score was 50. (R. at 213).

Ms. Dye was then placed on a follow- up group therapy plan that she never attended. (R. at 204-07). Then she was placed on an individual therapy plan with which she also failed to comply. (R. at 202).

Ms. Dye began visiting the clinic again starting on June 15, 2006. (R. at 255). The report notes that she stated that she did not get much help from the center and they did not set her up with any follow-up therapy. (R. at 255). Ms. Dye further stated that she was not doing well and

that Zyprexa helped her previously. (R. at 255). The doctor notes that this is a bipolar prescription and thus prescribed it to her. (R. at 255).

Ms. Dye returned to the clinic on July 13, 2006 to treat a urinary tract infection. (R. at 253). She underwent lithotripsy on August 4, 2006 at Hancock Regional Hospital after being seen in the emergency department for right upper quadrant pain, nausea, and vomiting. (R. at 231-32). She visited the clinic again on July 26, 2006 and September 26, 2006 for stomach pain. (R. at 249, 251).

On October 30, 2006, she returned to the clinic because of abdominal pain, irritable bowel syndrome, and aching knees. (R. at 247). The doctor conducted a computed tomography (CT scan), which is protocol after a cholecystectomy and stated that her knee pain was not osteoarthritis, and that her bowels were normal. (R. at 247).

On January 2, 2007, Ms. Dye was seen again at the clinic for follow-up to emergency room visit the previous night regarding painful passing of kidney stones. (R. at 245). She complained of seizures that morning. (R. at 245) . She also discussed problems with her medication, memory, and motivation. (R. at 245). She was prescribed lexapro in addition to her other medication. (R. at 245).

On January 9, 2007, Dr. Angela Marshall ("Dr. Marshall") provided a consultative examination of Ms. Dye for the Social Security Determination Bureau to evaluate the impact her mental conditions have on her ability to function. (R. at 260). Although Dr. Marshall does not diagnosis Ms. Dye with bipolar disorder, she restates that diagnosis based on information from Ms. Dye and assigns a GAF score of 50. (R. at 262). Dr. Marshall ultimately concluded that "it does not appear as if psychological factors are significantly and adversely affecting [Ms. Dye's] ability to maintain gainful employment." (R. at. 262).

On January 20, 2007, Dr. Kassab conducted another consultative evaluation to discern the impact of Ms. Dye's physical conditions on her ability to engage in work related activities. (R. at 263). Dr. Kassab once again essentially noted that Ms. Dye is able to function normally physically. Though some slight weakness on her right side, she is able to grasp, lift, carry, manipulate object with both hands, repeat movements with both feet, and is able to bend over without restriction and squat. (R. at 265). Dr. Kassab further noted that she is able to sit, stand, and walk normally. (R. at 265).

After this period, Ms. Dye frequented the clinic and a number of specific doctors and specialists that discussed, treated, and diagnosed her with various other ailments. She had general visits to the clinic again on February 6, 2007 due to persistent pelvic pain for three days, (R. at 243), on April 10, 2007 for "dry spots and recent exposure to scabies, (R. at 241), and on April 17, 2007 for having pain all lasting for two months, (R. at 239).

Dr. F. Kladder ("Dr. Kladder") completed a Psychiatric Review Technique Form for Ms. Dye on February 21, 2007. He concluded that Ms. Dye had Bipolar Disorder Not Otherwise Specified.[2] He concluded by quoting Dr. Marshall that "it does not appear as if psychology factors are significantly and adversely affecting her ability to maintain gainful employment." (R. at 283).

On May 16, 2007, Ms. Dye was treated at the emergency room for back pain. (R. at 347). She was given various medications while there including morphine and hydromorphone.

---

[2] This is when a person has symptoms of the illness that do not meet the diagnostic criteria for either bipolar I or II. *Introduction: Bipolar Disorder*, NAT'L INST. OF MENTAL HEALTH,
http://www.nimh.nih.gov/health/publications/bipolar-disorder/complet-index.shtml/index.shtml (last visited July 11, 2012). However the symptoms are clearly out of the person's normal range of behavior. *Id.*

(R. at 347). The attending physician's impression was that she had acute thoracic strain. (R. at 348). He subsequently discharged Ms. Dye with various back pain instructions. (R. at. 348).

Ms. Dye presented again at the emergency room due to suicidal ideation on July 23, 2007. (R. at 433). She was diagnosed with bipolar II disorder and prescribed various medications and therapy. (R. at 432, 434). However, she only followed through with the treatment and medication from July 23, 2007 through January 14, 2008. (R. at 433-505).

On November 19, 2007, Dr. Herbert Biel ("Dr. Biel") treated Ms. Dye at the clinic for back pain and motion limitations. He concluded that she had fibromyalgia. (R. at 297). Upon his referral on January 2, 2008, Dr. John Chase ("Dr. Chase") was able to treat Ms. Dye. (R. at 304). He found that she was essentially healthy and quite limber, but her pain was most likely chronic fibromyalgia syndrome. (R. at. 305). Also on January 8, 2008, Dr. Chase treated and concluded that Ms. Dye's symptoms were a manifestation of fibromyalgia. (R. at. 299).

On January 11, 2008, Ms. Dye was treated by Dr. Phillip Sailer ("Dr. Sailer") for bilateral knee pain. (R. at 413). Upon examination, Dr. Sailer noted that Ms. Dye stated she had fallen skating several years before which compounded her back pain. (R. at 416). He concluded that Ms. Dye had bilateral patellofemoral pain and assigned her to physical therapy. (R. at 414).

On January 28, 2008 during a follow-up exam, Dr. Chase found that Ms. Dye had mild disk bulging at L4-L5 and recommended that she continue her therapy, but did not list fibromyalgia as a "current problem". (R. at 300-01). On April 28, 2008, Dr. Chase noted as one of the additional medical complications experienced by Ms. Dye was that she did in fact have fibromyalgia as a current problem. Dr. Amy Wooldridge ("Dr. Wooldridge") treated Ms. Dye on July 9, 2008 for chief complaints of diffused pain in multiple joints, hot flashes, shortness of

breath, and other complaints. (R. at 307). Dr. Wooldridge concluded that Ms. Dye was mostly depressed and had chronic pain throughout her body. (R. at 308).

On August 23, 2008, Ms. Dye went to the emergency room with complaints of extreme fatigue in her shoulders and constipation. R. at 341. She was diagnosed with arthralgia signifying joint pain and fatigue. (R. at 344). She was then referred her to a primary care physician. (R. at 344).

Dr. Douglas Smith ("Dr. Smith"), a rheumatologist, evaluated Ms. Dye on August 27, 2008 regarding her complaints of "pain all over." (R. at 316). Dr. Smith essentially concluded that she had fibromyalgia, borderline hypercalcemia of uncertain significance, slightly elevated sedimentation rate, and slightly elevated CPK of doubtful clinical significance. (R. at 317).

On February 18, 2009, Ms. Dye was seen again by Dr. Wooldridge as a follow-up from having been seen in the emergency room for elevated blood pressure, chest pressure, and neck pain the day before. (R. at 328, 333). In the emergency room, she was given morphine and several other medications for her pain and numbness in her hands. (R. at 334). Ms. Dye's lapse in continuous treatment from Dr. Wooldridge was accredited to fiscal challenges. (R. at 328). Essentially, Dr. Wooldridge concluded that Ms. Dye had possible fibromyalgia, albeit chronic back pain and no focal tender points presented on that day, and positive for depression along with a myriad of other ailments. (R. at 328-31).

On March 25, 2009, while visiting an associate in the hospital, Ms. Dye was admitted due to feelings of dizziness, throat tightness and chest heaviness. (R. at 324). She was released that same day due to the impression of not having a pulmonary embolism after having been given several medications. (R. at 327).

### C. The Administrative Hearing

#### 1. Ms. Dye's Testimony

At the hearing on July 7, 2009, Ms. Dye testified that she was thirty-seven years old, had not worked since November 28, 2006, and she only had a 9th grade education. Ms. Dye then agreed with the statements of her attorney, Thomas Steinke ("Mr. Steinke"), who summarized the evidence as well as what Ms. Dye would testify to in person. (R. at 47-51).

#### 2. Vocational Expert's Testimony

The vocational expert, Ray Burger ("VE") testified after Ms. Dye and her attorney's evidential summary. (R. at 54). First, the VE testified that he had examined Ms. Dye's file from a vocational perspective. (R. at 53). He then classified Ms. Dye's previous work experience according to the Dictionary of Occupational Titles. (R. at 53). The ALJ then posed a hypothetical to the VE to determine whether Ms. Dye was able to perform jobs that were available in the state economy. (R. at 54). The ALJ asked the VE to consider various factors such as a claimant of similar background to Ms. Dye, who was moderately limited in her concentration, persistence, or pace; moderately limited in the areas of her ability to understand, remember, and carry out detailed instructions and to interact appropriately with the general public; and mildly limited in her activities of daily living and social interaction could perform. (R. at 54). The VE was also asked to consider a person who could lift or carry 20 pounds occasionally and 10 pounds frequently; sit for six hours and stand/walk for four hours total in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally bend or stoop; frequently reach above shoulder level, handle, or finger with her dominant right hand; and never perform work that requires anything more than concentrated exposure to unprotected heights and moving machinery no more than superficial interaction with the public, coworkers, and

supervisors. (R. at 54). The VE testified that such a person could perform the representative, unskilled, light jobs of inspector (4,210 jobs), assembler (5,212 jobs), and machine operator (3,405 jobs), but not the previous work identified as performed by Ms. Dye. (R. at 55). The VE further testified that a for a person who is consistently off task more than 15 percent of the time and would habitually miss at minimum one to three days a month there would not be compatible with full-time employment. (R. at 55).

## II. **STANDARD OF REVIEW**

To be eligible for social security income and disability insurance benefits, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.
2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.
3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.
4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity ("RFC"), the claimant is not disabled.

> 5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled .

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Youth v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See e.g.*, *Henderson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence significantly supports the ALJ's findings and is otherwise free from error. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234. While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion" *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson*, 402 U.S. at 401). Furthermore, the ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.

1994).  Finally, an ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III. DISCUSSION

#### A. The ALJ's Findings

The ALJ found that Ms. Dye has not engaged in substantial gainful activity since her application date of November 28, 2006.  (R. at 18).  He found that Ms. Dye had diabetes mellitus, general joint and muscle pain, depression, and anxiety.  (R. at 18).  The ALJ found that these impairments were severe as defined under the Social Security Act and had caused more than a minimal effect on the claimant's ability to engage in work related activity.  (R. at 18).  The ALJ concluded, however, that Ms. Dye did not have an impairment or a combination of impairments that meets or medically equals one included in Listings 1.00, 14.00, 12.04, and 12.06.  (R. at 20).  The ALJ found that Ms. Dye had a residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) and consistent with the following capabilities: lift, carry, push, and pull up to twenty pounds occasionally; lift, carry, push, and pull ten pounds frequently; stand for four hours in an eight hour work day; walk for four hours in an eight hour work day; and sit for six hours in an eight hour work day.  (R. at 23).  The ALJ, however, found that Ms. Dye's residual functional capacity to perform light work was limited, and as such, she was unable to perform the following type of work: work requiring more than occasional stooping, or bending; work requiring any climbing of ladders, ropes and scaffolds; work requiring more than frequent above shoulder level reaching, handling or fingering with the dominant right hand; work that includes anything more than concentrated exposure to unprotected heights and moving machinery.  (R. at 23).  The ALJ further concluded that Ms. Dye

is moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; and interact appropriately with the general public. (R. at 23).

Based on Ms. Dye's residual functional capacity assessment, the ALJ concluded that she was unable to perform her past relevant work as a cafeteria server, homecare giver, food sampler, nurse assistant, and packer. (R. at 33). Based on the vocational expert's testimony and considering Ms. Dye's age, work experience, education, and residual functioning capacity, the ALJ concluded that Ms. Dye is capable of performing other work that exists in significant numbers in the national economy such as being an inspector, assembler, or a machine operator. (R. at 34). Accordingly, the ALJ concluded that Ms. Dye was not disabled, as defined in the Social Security Act, since November 26, 2006, the date the application was filed.

### B. Ms. Dye's Arguments on Appeal

Ms. Dye essentially makes three arguments on appeal. First, she argues that substantial evidence does not support the ALJ's Step 3 analysis. Second, she argues that the ALJ's credibility determination at the time he rendered his decision was flawed. Third, Ms. Dye argues that the ALJ's Step 5 analysis is not supported by substantial evidence when he ignored evidence that her combined impairments rendered her disabled. The Court will address each of these arguments in turn.

#### 1. The ALJ's Step 3 Analysis

To reiterate, the ALJ concluded that Ms. Dye's impairments did not meet or medically equal impairments found in the regulations' Listing of Impairments after considering sections 1.00, 14.00, 12.04, and 12.06. Ms. Dye argues that the ALJ erred in finding that her combined impairments of fibromyalgia, depression and anxiety/panic did not meet or medically equal Listing 12.04 of 20 C.F.R. 404 Subpart P, Appendix 1. Appendix 1 lists mental disorders

consisting of seven broad mental disorder classifications. *See* 20 C.F.R. 404 Subpart P, Appendix 1. Within each classification, there is a list of required medical findings (Paragraph A criteria), impairment related functional limitations (Paragraph B criteria), and, in some categories, additional functional criteria (Paragraph C criteria). *Id.* In order to meet or medically equal a listed disability under 12.04, for example, the claimant must show that he or she meets a category's Paragraph A criteria, and its Paragraph B or Paragraph C criteria. *See id.*; *see also* 20 C.F.R. § 416.920 (establishing that the claimant bears the burden of proving that her conditions meet or medically equal a listing).

Ms. Dye contends that her combined impairments meet or equal Listing 12.04: Affective Disorders. Under Listing 12.04, the claimant must show that he or she suffers from at least one medically documented impairment. 20 C.F.R. 404 Subpart P, Appendix 1. In addition the claimant must show that that his or her listed impairment results in at least two listed functional limitations. Specifically, Ms. Dye claims that she suffers from depressive syndrome characterized by anhedonia, sleep disturbance, difficulty concentrating or thinking, and thoughts of suicide. *See* Dkt. 17 at 9-10. Furthermore, Ms. Dye asserts that her impairments result in (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; and (3) marked difficulties in maintaining concentration, persistence, and pace. In support of her argument that she has met her burden under Listing 12.04, Ms. Dye contends that the ALJ erroneously failed to (1) consider additional medical evidence from other medical sources that supported her Step 3 claim and failed to (2) summon a medical advisor to testify whether Ms. Dye's combined impairments medically equal a listed impairment.

13

### i. Additional Medical Evidence

Ms. Dye relies on the medical evaluations of Drs. Biel, Chase, and Smith to establish that she has fibromyalgia syndrome, which the ALJ should have acknowledged as one of her impairments. Specifically, Ms. Dye claims the ALJ ignored the examination reports from the above mentioned doctors which provide evidence that contradicts the ALJ's Step 3 conclusion. The Court disagrees. The ALJ in rendering his decision sufficiently acknowledged the opinions of Drs. Chase and Smith in considering whether the impairments alone or in combination met or medically equaled any of the listed impairments. (R. at 20-21). As such, the ALJ's Step 3 findings were supported by substantial evidence.

Here, the ALJ did not ignore or reject additional medical evidence from Drs. Chase, Biel, and Smith. To the contrary, the ALJ acknowledged, for example, the treatment history of Dr. Chase and Dr. Smith as well as their impressions of Ms. Dye's symptoms. For instance, the ALJ indicated that Dr. Chase noted Ms. Dye had "a manifestation of fibromyalgia syndrome" and that Dr. Smith noted that "she had soft tissue tender points in the spine, neck, shoulders, hips…that were consistent with the condition." (R. at 20). However, in the end, the ALJ relied upon Dr. Wooldridge's findings that after examining Ms. Dye, she had "chronic pain – basically diffuse full body pain" instead of fibromyalgia. In doing so, the ALJ's decision to characterize Ms. Dye's symptoms as general joint and muscle pain followed his analysis of the medical evidence as a whole. *See Anderson v. Barnhart*, 175 Fed. Appx. 749, 754 (7th Cir. 2006) (rejecting claimant's argument that the ALJ ignored all evidence proving she had a mental impairment under Listing 12.05 when the ALJ considered the evidence as a whole).

In addition, even assuming *arguendo* that Ms. Dye was diagnosed with a fibromyalgia impairment, she has not met her burden to show that she has marked limitations in her activities

of daily living, social functioning, or in maintaining concentration, persistence, and pace due to fibromyalgia. Here, Dr. Rasmussen, Dr. Kladder, and Dr. Marshall all conducted psychiatric evaluations of Ms. Dye. In performing these evaluations, each doctor noted Ms. Dye's subjective complaints and noted their objective observations. In concluding that Ms. Dye only had mild difficulties in her activities of daily living and social functioning, the ALJ considered the testimony of the claimant, her mother, who reportedly spends "24 hours" with her, and the opinions of the state agency medical consultants. Ms. Dye cites her subjective report to Dr. Rasmussen indicating that she does not cook, clean, or do laundry on a regular basis as evidence of her marked restriction of activity. However, when the ALJ asked the claimant to describe her usual day, she stated that she "takes her son to school, takes medications, rests, eats breakfast, goes to the grocery store, comes home, rests, eats lunch, bathes, talks to friends on the phone, and goes to school to get her son." (R. at 21). With respect to her social functioning, the ALJ noted inconsistencies in Ms. Dye's subjective statements. Specifically, he noted her representation to the agency that she has no problems with her friends or relatives and her mother's statement that "she get along 'fine' with authority figures. (R. at 21). Furthermore, the ALJ noted that the evidence shows that she interacts with her son on a daily basis, visits friends, and shops with her mother. Lastly, Dr, Marshall noted that Ms. Dye has moderate difficulty with concentration, persistence, and pace, but did not opine that this limitation was disabling. Accordingly, the Court concludes that the ALJ acknowledged the medical evidence as a whole on the record in finding that Ms. Dye's impairments did not meet or medically equal the listed impairments at 12.04 of 20 C.F.R. 404 Subpart P, Appendix 1.

### ii. Consulting a Medical Advisor

Ms. Dye contends that the ALJ erred in not summoning a medical advisor to testify whether her combined impairments medically equaled a listed impairment. "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). An ALJ must rely on a medical expert's opinion when finding a claimant does not meet or equal a listed impairment. SSR 96-6p, 61 Fed. Reg. 34466, 34468 (July 2, 1996). In some instances, this requires the ALJ to hear additional evidence from a medical examiner. *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (noting that the ALJ incorrectly made medical conclusions instead of consulting a medical examiner). However, when the medical evidence in the record is sufficient to make a decision, the ALJ may rely on it alone. *Similia v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). In particular, "[w]hen an [ALJ]…finds that an individual's impairment(s) [are] not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by a [SSA-831-U5 or SSA-832-U5 or SSA-833-U5] signed by a State agency medical or psychological consultant." SSR 96-6p, 61 Fed. Reg. at 34468.

Here, the state agency's reviewing physicians and psychologists opined that Ms. Dye's physical impairments as well as mental impairments were not severe. The ALJ relied on the medical reports from Drs. Ruiz, Fife, Kladder, and Larsen who each signed a Disability Determination and Transmittal Form similar to the SSA-831-U5. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding that disability forms completed by state agency physicians conclusively establish that a physician designated by the agency has given consideration to the question of medical equivalence). Ms. Dye attempts to rely upon *Barnett*, but her reliance is misplaced because the ALJ in *Barnett* did not consult a medical expert at all or rely on a signed

16

Disability Determination and Transmittal Form. *Barnett*, 381 F.3d at 670-71. Instead, the ALJ based his findings on his own layman opinion. *Id.* at 671. By contrast, the ALJ in this present case grounded his findings in medical opinions from state agency physicians and psychologists. (R. at 22-23). As such, substantial evidence supports the ALJ's Step 3 findings, and the claimant has not met her burden to establish that her impairment met or medically equaled a Listing Impairment. Accordingly, the Court finds that the ALJ did not err in holding a hearing without summoning a medical advisor to testify in this case.

### 2. Ms. Dye's Credibility Determination

Ms. Dye contends that the ALJ's credibility determination was flawed and warrants a reversal because it was intentionally vague and contrary to SSR 96-7p. Specifically, Ms. Dye emphasizes the ALJ's determination that her statements concerning her intensity, persistence, and limiting effects of her symptoms were not credible. (R. at 25). Pursuant to SSR 96-7p an ALJ is required to provide specific reasons for its credibility determination with respect to an applicant's description of symptoms. The Commissioner argues that the ALJ provided sufficient reasons supporting his credibility determination. The Court agrees. Here, the ALJ evaluated the degree to which Ms. Dye's stated limitations were consistent with the medical evidence. For example, the ALJ reviewed Ms. Dye's subjective statements regarding her symptoms and compared them with the medical evidence set forth by the doctors, such as Dr. Kassab. Furthermore, the ALJ noted Dr. Kassab's notations and observations regarding Ms. Dye's purported symptoms and the results from his examinations of her. In addition, the ALJ considered Ms. Dye's testimony, her mother's reported statements, her mental examination results, as well as the medical opinions in the record in reaching his conclusion regarding her

17

credibility determination.  *See Anderson*, 175 Fed. Appx. at 754.  Accordingly, the Court concludes that the ALJ did not err in his credibility determination.

### 3. The ALJ's Step 5 Analysis

Lastly, Ms. Dye argues that the ALJ erred in his Step 5 analysis.  Specifically, she claims that the RFC "omits all of the limitations due to the claimant's quite severe, chronic pain and depression as is shown by the assessed GAFs of 50."  In addition, she claims the ALJ "arbitrarily disregards the severely limiting impact of the claimant's chronic significant pain on her ability to sustain any full-time employment."  Dkt. 17 at 25.  The Commissioner argues that substantial evidence supports the RFC finding by the ALJ.  After reviewing the ALJ's analysis regarding his RFC determination, the Court agrees with the Commissioner.

Ms. Dye attempts to rely on her GAF scores as indicated in the medical record as 45, 50, and 60 (on the high end) to establish that her impairments were severe.  While a GAF score of 50 can demonstrate that the claimant exhibits moderate limitation, this falls a step below what the limitations required in Paragraph B of 12.04 of the Listing Impairments.  *See* 20 C.F.R. § 404.1520(c)(4).  Furthermore, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his [or her] GAF score."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).  Additionally, "an ALJ is not required to address every piece of evidence but is instead required to build a logical bridge from the evidence to [his] conclusions.  *Similia*, 573 F.3d at 516.  Here, the ALJ supported his conclusions with sufficient medical evidence from the evidence of record.  Finally, the ALJ's hypothetical to the VE incorporated his RFC finding that included the limitations he found to be credible and supported by the medical evidence.  Afterward, the VE testified that Ms. Dye could perform other jobs that exist in significant numbers in the national economy.  Accordingly, the

Court concludes that substantial evidence supports the ALJ's conclusion with respect to his Step 5 analysis.

## IV. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of the Social Security Administration is **AFFIRMED**. Final Judgment shall be entered accordingly.

SO ORDERED.    09/30/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com